E-FILED
Friday, 30 October, 2015  02:46:37 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.   15-cv-1333 |
| | ) | |
| DONNA GEARING and LARRY THOMASON, | ) | |
| | ) | |
| Defendants. | ) | |

# <u>O R D E R   &   O P I N I O N</u>

This matter is before the Court on the United States' Objections (Doc. 7) to Magistrate Judge Hawley's Report and Recommendation (Doc. 6) that the Court Deny the United States' Motion for Order in Aid of Immediate Access (Doc. 3). For the reasons that follow, the Court concludes that the United States' objections are well-taken and respectfully rejects the recommended disposition. Instead, the Court grants the United States' Motion for Order in Aid of Immediate Access, a decision that is dispositive of the case.

## PROCEDURAL HISTORY

The United States filed a Complaint against Donna Gearing and Larry Thomason pursuant to Section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9604(e). It seeks access to property that houses the remains of a burned-down former school building ("the Site") so that the United States Environmental Protection Agency

("EPA") can test for the presence of certain hazardous substances and remove hazardous substances that it knows are currently present on the Site.

The Complaint seeks an order against Gearing (the owner of record) granting the EPA, its employees, representatives, and contractors any and all access to, through, over, and under the Site for the duration of time necessary for the EPA to conduct an investigation and perform necessary response actions. (Doc. 1 at 9). It also seeks an order against Gearing and Thomason (the man whom asserts ownership, and whom Gearing has stated is the owner), enjoining them for interfering with the access. (*Id.*).

On the same day that the United States filed its Complaint, it also filed a Motion for Order in Aid of Immediate Access. (Doc. 3).  This motion requests relief that is dispositive of the case. The United States specifically requests an order granting the EPA and its representatives immediate access to the Site so they can take additional samples and conduct necessary cleanup. (*Id.* at 13-14). This could include excavating contaminated soil, disposing of hazardous substances off-site, and demolishing the building. (*Id.* at 14).

The United States served Defendant Gearing on August 20, 2015 (Doc. 9) and Defendant Thomason on August 24, 2015. (Doc. 5). Neither Defendant has filed an answer or a response to the pending motion.

Judge Hawley issued a report and recommendation on September 14, 2015. (Doc. 6).  In it, he recommended that the Court deny the United States' motion. He reasoned that the United States' request for access to remediate was arbitrary and

capricious because there was no proportionality between the United States' evidence of contamination and proposed rehabilitation plan.

The United States then filed its objections to the Report and Recommendation. It argues that the Report and Recommendation both understated the degree of contamination found at the Site and overstated the scope of remediation that it seeks. At the United States' request, the Court held a hearing on the matter on October 28, 2015. Defendant Thomason appeared and represented himself *pro se* at the hearing, but Defendant Gearing was absent. During the hearing, the Court heard testimony from Craig Thomas, who is the On-Scene Coordinator for Region 5 of the EPA.

## FACTUAL BACKGROUND

The Site to which the EPA would like access is about 1.3 acres in the Village of Vermont in Fulton County, Illinois. It is bordered by First South Street to the north, North Main Street to the east, North Alley Street to the south, and North Liberty street to the west. The Site is in a residential area, and homes are situated within about fifty feet of the property.

On December 12, 2012, a fire left the school building on the Site mostly destroyed. What remains is in a severe state of disrepair.[1] It is unclear who currently owns the property. Defendant Gearing is the owner of record, and currently lives in a nursing facility, as she recently suffered a stroke. Defendant Thomason has asserted

---

[1] The United States submitted with both its Motion and its Objections to the Report and Recommendation declarations by Craig Thomas, EPA's local On-Scene Coordinator. Both declarations contain a number of photographs that show the property described in greater detail. (*See* Docs. 4-3 and exhibits and 7-2, 7-3 and exhibits).

ownership without the objection of Gearing or her husband. Gearing and Thomason entered into a contract for sale of the property on January 15, 2013, after the fire destroyed the building, but there is no evidence that Thomason has recorded a dead or affidavit of title. Since the fire, Thomason has done work at the Site.

The Illinois Environmental Protection Agency ("Illinois EPA") conducted an inspection of the Site on May 1, 2013 pursuant to an administrative search warrant, during which it took samples from and photographs of the Site. During the course of its inspection, the Illinois EPA obtained fourteen samples that it suspected might contain asbestos. Of the fourteen, nine tested positive for asbestos.

Six of the Illinois EPA's samples came from a 96-cubic foot debris pile in the building's boiler room. The first three were taken from an air cell that was part of the pile, and were 70-80 percent asbestos. The next three were taken from mag block insulation, and were 10-20 percent asbestos. The seventh sample, taken from insulation outside of the boiler room, tested negative for asbestos.

Samples eight, nine, and ten were taken from floor tiles in the basement. The basement floor tiles cover approximately 1,800 square feet of the building. Each of those samples was 3-5 percent asbestos. Samples eleven, twelve, and fourteen were of ceiling tiles taken from a room along the east wall of the building, and all tested negative for asbestos. Sample thirteen was of window caulking from an entry door, and it too tested negative for asbestos. All of the samples except for sample thirteen could be reduced to powder with hand pressure. The Illinois EPA also observed suspected asbestos containing material that it could not test because it was inaccessible. This includes suspected spray-on asbestos on pipes.

The Illinois EPA referred the matter to the EPA. In April of 2014, the EPA's on-scene coordinator, Craig Thomas, visited the property. On April 22, 2014, he observed the Site from a public right of way, and saw piles of suspected asbestos-containing materials. He also observed on-site graffiti, which suggested to him the presence of trespassers.

Based upon the results of the on-site testing and his own observations, Thomas concluded that the Site poses a public threat health and sought access so he could conduct further testing and clean-up at the Site. Thomas sought and obtained approval and funding from the EPA to undertake a "Time-Critical Removal Action" as provided for in the National Contingency Plan, 40 C.F.R. § 300.415(b). (Doc. 4-5 at 2, 13).  As he stated in his memorandum to the EPA:

> The purpose of this Action Memorandum is to request and document your approval to expend up to $548,624 to conduct a time-critical removal action at the former Vermont School Site (Site) located in Vermont, Fulton County, Illinois. The proposed time-critical removal action herein will mitigate the threats to public health, welfare, and the environment posed by the presence of unsecured asbestos and asbestos containing material (ACM) in waste piles located at the Site.

(Doc. 4-5 at 2). Based on the condition of the Site, Thomas indicated that he believed there was nothing at the Site that could "prevent asbestos from migrating from the former building footprint and being released into the environment." (*Id.* at 8). Thomas requested approval to conduct removal activities, which he opined are not disproportionate to the dangers posed by the property, including:

1) Develop and implement a Site Health and Safety Plan to include a Perimeter Air Monitoring and Sampling Plan and develop measures to control ACM dust during the removal and deconstruction of the facility.

2) Develop a site specific sampling plan, to conduct additional characterization of the Site to determine the nature and extent of asbestos contamination and other hazardous substances in soil to support the removal action.

3) Excavate any soil contained with asbestos and other hazardous substances in and around the Site that presents an unacceptable risk to public health and the environment.

4) Transport and dispose of all characterized or identified hazardous substances, pollutants, wastes, or contaminants that pose a substantial threat of release at a CERCLA approved disposal facility with appropriate permits.

5) As necessary, deconstruct the building at the Site to excavate, recycle, load, transport, and dispose of readily identifiable ACM wastes, debris and underlying contaminated soil. All hazardous material will be disposed of at an EPA-approved disposal facilities [sic] in accordance with EPA's Off-Site Rule (40 CFR § 300.440).

6) Post-confirmation sampling will be conducted in accordance with the site specific sampling plan to confirm efficacy of the removal actions.

7) Backfill excavated areas with clean material and topsoil. Restore excavated and disturbed areas and vegetate to prevent soil erosion.

8) Take any other response actions to address any release or threatened release of a hazardous substance, pollutant or contaminant that the EPA OSC determines may pose an imminent and substantial endangerment to the public health of the environment.

(*Id.* at 9-10). Thomas projected that the total cleanup could cost up to $548,624. (*Id.* at 11).

The Director of the Superfund approved Thomas's request, (*id.* at 13), and Thomas then began an ultimately unsuccessful process of trying to obtain Gearing and Thomason's permission to enter the Site for testing and removal. Because the EPA could not obtain either Defendant's compliance, the United States has come to the Court and requested an order allowing it access.

6

At the hearing, Defendant Thomason admitted to the existence of identifiable asbestos at the site that was present in six piles of debris before the fire; and afterward, in the two debris piles, located in the boiler room and the basement; and he stated that he has been engaged in his own efforts to eliminate it from these two remaining piles. He testified that when the asbestos is wet, he has been sorting it from other debris, and then moving the sorted asbestos to a concrete electrical vault that is also on the Site. He said that he does not remove asbestos when it is dry. Thomason testified that he moved the asbestos containing material from the pile in the boiler room to the on-site electrical vault, but many of the asbestos-containing floor tiles in the pile in the basement remain on the premises.

Essentially, Thomason's objection to the EPA's motion reflects his view that the limited amount of asbestos existing in the two debris piles does not warrant the broad remedial actions contemplated by the EPA in its remedial plan at a budged cost of over half a million dollars. He suspects that the remedial plan is a subterfuge to completely demolish the building, which is an eyesore, at an exorbitant cost that is beyond his financial ability to reimburse in order to preserve his ownership interest in the Site. This position mirrors the concern of the Report and Recommendation that the proposed remedial plan is disproportionate to the asbestos risk associated with the two debris piles.

## LEGAL STANDARDS

When a plaintiff timely files an Objection to a Report and Recommendation, the Court reviews *de novo* those portions of it to which a specific written objection has been made. Fed. R. Civ. P. 72(b)(3). "The district judge may accept, reject, or

modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." *Id*.

**DISCUSSION**

The United States objects to the Report and Recommendation's conclusion that it has not met its burden for obtaining access to the Site in order to remove hazardous substances. Before reaching merits of the United States' objections, a brief statutory overview is necessary.

**I.     Statutory Overview**

CERCLA affords the EPA broad powers to clean up sites where hazardous substances have been released or threatened to be released into the environment. *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994) ("As its name implies, CERCLA is a comprehensive statute that grants the President broad power to command government agencies and private parties to clean up hazardous waste sites."). Under CERCLA, a "release" is "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . ." 42 U.S.C. § 9601(22). When there is an actual release or substantial threat of release of a hazardous substance into the environment, the EPA is "authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance . . . or take any other response measure consistent with the national contingency plan" that the EPA deems necessary to protect the public health or welfare or the environment. 42 U.S.C. § 9604(a)(1).

CERCLA provides a number of mechanisms for the EPA to obtain access to a Site. The EPA may enter a Site when "there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant." 42 U.S.C. § 9604(e)(1). It may enter "[a]ny vessel, facility, establishment, or other place or property" where a hazardous substance, pollutant, or contaminant (1) is or has been generated, stored, treated, disposed of, or transported from, (2) has been or may have been released, (3) is or may be threatened to be released, or (4) anywhere else entry is needed to determine the need for response or the appropriate response or to effectuate a response. *Id.* at § 9604(e)(3). Once there, EPA officials can "inspect and obtain samples" from places they are authorized to access, *id.* at § 9604(e)(4), or "determin[e] the need for response, or choos[e] or tak[e] any response action under this subchapter, or otherwise enforce[e] the provisions of this subchapter." *Id.* at § 9604(e)(1).

In the event that the EPA cannot obtain consent to enter a site, the statute provides it with two other ways in which it can obtain access. First, the EPA may obtain an administrative order directing compliance with the request for access. *See id.* at § 9604(e)(5)(A). If the site owners do not comply with the administrative order, the EPA can ask the Department of Justice to initiate a civil action to compel compliance with the order. *Id.* at § 9604(e)(5)(B); *see also  United States v. Tucard, LLC*, 738 F. Supp. 2d 243, 244 (D. Mass. 2010); *United States v. City of New Orleans*, 86 F. Supp. 2d 580, 582-83 (E.D. La. 1999). CERCLA also provides that the Department of Justice can initiate a civil action to compel compliance with a request by the EPA for entry. *See* 42 U.S.C. § 9604(e)(5)(B)("The President may ask the

Attorney General to commence a civil action to compel compliance with a request . . .

."); *see also United States v. Mountaineer Refining Co.*, 886 F. Supp. 824, 826-27 (D. Wyo. 1995).[2]

A court will grant the EPA access to property when four prerequisites are met. First, the site must be a "vessel, facility, establishment, or other place or property;"

---

[2] The Report and Recommendation suggests that the EPA must obtain an administrative order in order to file a lawsuit pursuant to 42 U.S.C. § 9604(e)(5)(B). (*See* Doc. 6 at 10 ("The natural reading of [§ 9604(e)(5)(A) and (e)(5)(B)] suggest[s] that the EPA must first issue an order and, should an owner refuse to comply, the EPA may then seek enforcement of its order with the court.")). However, the Report and Recommendation concluded that the United States could file a lawsuit to obtain entry without the EPA first obtaining an administrative order pursuant to § 9604(e)(6), which provides that "[n]othing in this subsection shall preclude the President from securing access or obtaining information in any other lawful manner." *Id.* To the extent that the Report and Recommendation suggests that § 9604(e)(5)(B) does not authorize the EPA to file a lawsuit without first obtaining an administrative order, the Court respectfully disagrees. First, a natural reading of § 9604(e)(5)(B) is consistent with the EPA's position that it need not obtain an administrative order in order to file a lawsuit. The subparagraph reads that "The President may ask the Attorney General to commence a civil action to compel compliance with a request or order referred to in subparagraph (A)." Both subparagraphs (A) and (B) make reference to requests. Subparagraph (A) makes it clear that administrative orders are issued *after* "an officer, employee, or representative" makes "any request . . . under paragraph (2), (3), or (4)" of § 9604(e)(5). And subparagraph (B) authorizes the United States to file a lawsuit after either an ignored request or administrative order.  To suggest, then, that the EPA must wait to file a lawsuit until it has obtained an administrative order with which the owner does not comply reads "request" out of § 9604(e)(5)(B). Second, the cases that the Report and Recommendation cites for the proposition that the United States can file a lawsuit without first obtaining an administrative order pursuant to § 9604(e)(6) but not § 9604(e)(5) do not make that distinction. Rather, the cases refer to § 9604(e)(5), and clearly state that the EPA need not first obtain an administrative order. *See, e.g., United States v. Tarkowski*, 248 F.3d 596, 599 (7th Cir. 2001)("Section 104(e)(5)(B)(i) provides that if consent to the entry is denied, the government may obtain a judicial order preventing interference with the entry . . . ."); *Mountaineer Refining Co.*, 886 F. Supp. at 826-27 (discussing §104(e)(5) of CERCLA, 42 U.S.C. § 9604(e)(5), and concluding that the United States may "seek enforcement in district court of its request for entry to which consent has not been granted . . . . It is not necessary for the United States to obtain an administrative order as a precondition for bringing a civil action in the district court.").

second, the EPA must have "a reasonable basis to believe there may be a release or threat of release of a hazardous substance;" third, the EPA must have requested consent for access to the site and been unsuccessful; and fourth, the EPA must seek entry to perform actions covered by the statute. 42 U.S.C. § 9604(e). The Report and Recommendation acknowledges that the Site is the type of site covered by § 9404(e)(3), that the EPA has a reasonable basis to believe there may be a release or threat of release of a hazardous substance, and that the EPA sought and was denied consent for access. (Doc. 6 at 14, n. 2).[3] At issue here is whether the EPA has met the fourth prerequisite: that it seeks access to perform actions covered by the statute. In that regard, the Report and Recommendation views the asbestos concerns to be limited to the two piles of debris, and questions whether such a limited amount of asbestos is out of proportion to the extensive remedial action proposed by the EPA. *See Tarkowski*, 248 F.3d 596.

## II.   Judicial Review of Requests for Access for Removal

Pursuant to Section 104(e)(5)(B)(i) of CERCLA, courts shall allow the EPA entry onto property and enjoin interference with the EPA's entry "unless under the circumstances of the case the demand for entry or inspection is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law." 42 U.S.C. § 9604(e)(5)(B)(i).

In *Tarkowski*, 248 F.3d 596, the Seventh Circuit considered the sort of showing the EPA must make in order to obtain access to property for the purpose of

---

[3] Asbestos is a hazardous substance pursuant to 42 U.S.C. § 9601(14). *See also* 40 C.F.R. § 302.4. And it is easy for the EPA to establish that it has a reasonable basis for believing asbestos is or could be released, as "there is nothing in section 104(e)(1) [of CERCLA] about magnitude." *Tarkowski*, 248 F.3d at 599.

further testing and remediation without first obtaining an administrative order. In such circumstances, a court must consider "whether the measures proposed [by the EPA] are a reasonable basis for authorizing what would otherwise be a trespass." *Id.* at 601-02.

In *Tarkowski*, the United States sought an order that would allow the EPA to enter the property of an elderly and poor man, fence off the property, conduct tests for contaminants, install groundwater-monitoring wells, dig up the property looking for any buried drums (and remove any buried drums found), remove contaminated soil, and cart away objects lying around on the property. *Id.* at 598. The United States supported its motion for access to conduct removal actions by presenting samples from the soil, drums, and pipe insulation that showed "trace amounts of contaminants." *Id.* "[T]here was no indication that [the trace amounts] exceeded the levels of these contaminants found in the surrounding properties none of which was deemed to pose any kind of environmental hazard or to require or justify remedial efforts." *Id.* Still, the United States brought the suit and claimed a right to access "without furnishing any factual basis for the claim that the environmental contamination at the Site . . . presents an imminent and substantial endangerment to the public health, welfare and the environment. . . ." *Id.* (internal quotation marks omitted).

The Court rejected the United States' "extreme position" that it "has an absolute right to an access order" so long as "it has probable cause to believe that there is even a thimbleful of a hazardous substance spilled in a person's yard. . . ." *Id.* at 599. Instead, it concluded that the judicial review provided for in CERCLA §

104(e)(5)(B)(i) requires that it consider the magnitude of the contamination against the scope of the EPA's proposed response. *See id.* at 602. When a site, "although unsightly is not a site or source of even a slight environmental hazard," the court concluded it would be arbitrary and capricious for the EPA "to go ahead and rip up the property without completing its inspection." *Id.* at 599. "Judicial carte blanche to embark on drastic remedial action" is unreasonable when it isn't supported by "any rational basis for believing there is any danger to the environment that would warrant such action." *Id.* at 600.

Judge Ripple wrote a short concurrence in which he agreed that Congress, by including Section 104(e)(5)(B)(i) in CERCLA allowing for review of access requests under an arbitrary and capricious standard, "did not intend to tolerate such intrusions when they are based on the very limited evidence of contamination put forward in [*Tarkowski*]." However, he noted that the facts presented were "narrow and unusual," factors that left "a conceptual and practical difficulty." *Id.* at 603 (Ripple, J. concurring). Judge Ripple believed the Court's opinion left it unclear what circumstances "will justify a court's denial of entry to effectuate a remedial order." *Id.* He imagined a situation in which the evidence of contamination would allow for "some sort of response action," but would make "the contemplated remedy seem *significantly disproportionate* to the perceived violation." *Id.* (emphasis added). He then read into the opinion the implication that "there must be proportionality between the investigative results and the proposed plan." *Id.* However, he cautioned that courts intent on balancing the evidence against the remedy could end up "assuming a great deal more latitude than Congress intended." *Id.*

### III.    Applying *Tarkowski*

The task the Court is left with is determining whether the EPA's existing evidence of asbestos contamination is sufficient to justify its proposed removal operation. The Report and Recommendation found that the United States' evidence of contamination was too thin to justify the requested relief, which he characterized as extensive. Following entry of the Report and Recommendation, the EPA submitted a more substantial brief and supplemental affidavit that put its evidence of contamination into more enlightening context. *See* Fed. R. Civ. P. 72(b)(3) (allowing a district judge to consider further information in resolving objections to reports and recommendations issued by magistrate judges). In light of this newly supplied information, the Court concludes that the United States has met its burden under *Tarkowski*.

### A.  The EPA's Evidence of Contamination

First, the Report and Recommendation considered the evidence of asbestos contamination. It characterized it as "more than nothing" but found that "it cannot be accurately characterized as substantial." (Doc. 6 at 14). The Report and Recommendation observed that the age of the testing – it was completed over two years ago – leaves some doubt that the property remains contaminated by asbestos. (*Id.*). The asbestos could have been moved, and it is possible that Defendant Thomason removed it. (*Id.*). The Report and Recommendation also observed that five of the fourteen samples tested negative for asbestos. (*Id.* at 15). Moreover, the nine positive samples came from "two relatively small locations" and contained varying degrees of asbestos, many of which were under twenty-percent. (*Id.*).

14

1:15-cv-01333-JBM-JEH   # 10   Page 15 of 23

The United States objects to each of the Report and Recommendation's characterizations. First, it argues that the conclusion that asbestos may no longer be a problem is contrary to its review of the evidence. The United States argues that if anything, the asbestos contamination has gotten worse since the Illinois EPA's initial sampling. When Craig Thomas visited the Site last year, he observed debris piles on the property that he suspected contained asbestos. (Doc. 7 at 8). Additionally, Defendant Thomason, by his own admission, has been conducting his own cleanup by moving asbestos and other debris by wheelbarrow to an "old electrical vault" on the Site. Given that the asbestos the Illinois EPA identified on Site is friable, the United States argues that if anything it is likely that contamination on site has worsened over time due to Thomason's improper self-cleanup. This is because friable asbestos loses structural integrity, tends to crumble, and can migrate throughout a site and into the environment. (*Id*.). Therefore, what might have begun as a smaller pile of asbestos containing material may have become a much larger area contaminated by asbestos. The United States' position is strengthened by Defendant Thomason's testimony during the hearing. At the hearing, Defendant Thomason admitted that there is a limited amount of asbestos on the property, but argued that he is as well-suited as the EPA to remove it. In his mind, the EPA's proposed plan for removing the asbestos is needlessly expensive. He said he knows how to safely remove asbestos, knows when to remove asbestos (when it is wet rather than when it is dry), and also knows how to readily identify asbestos.

Second, the United States argues that it has presented evidence that the amount of asbestos containing material located on site is substantial and the amount

15

of asbestos in that material is substantial. The Illinois EPA took representative samples that tested positive for asbestos from two areas of debris; the first is a 96 cubic feet pile in the boiler room, and the second is 1,800 square feet in the building's basement throughout which 9" x 9" floor tiles are intermingled with other debris. The United States asserts that these debris piles constitute substantial amounts of asbestos containing material. As a point of comparison, it points to the National Emission Standards for Hazardous Air Pollutants ("NESHAP") for asbestos regulations. The NESHAP regulations apply when an owner or operator of a piece of property wishes to conduct certain demolition or renovation activities. 40 C.F.R. § 61.145(a). In circumstances in which there are at least 160 square feet or 35 cubic feet of regulated asbestos-containing material, owners and operators of property must follow particular procedures with respect to notification and emission control. *See id*. As the Seventh Circuit has explained, the NESHAP procedures for friable asbestos apply because dry and friable asbestos pose "a particular danger . . . because it can easily become airborne." *United States v. B&W Inv. Props.*, 38 F.3d 362, 364 n. 3 (7th Cir. 1994). Here, the known quantities of asbestos containing materials are many times the amount of those that trigger requirements imposed by the NESHAP regulations.

The United States also argues that the amount of asbestos found in the samples is substantial. Under NESHAP, "friable asbestos material" is defined as "any material containing more than 1 percent asbestos as determined using . . . Polarized Light Microscopy, that, when dry, can be crumbled, pulverized, or reduced to powder by hand pressure." 40 C.F.R. § 61.141. There is a similar definition in

OSHA regulations. *See* 29 C.F.R. § 1910.1001 (using one-percent as the threshold for defining friable asbestos-containing material). Indeed, EPA guidance materials suggest that the one-percent threshold may be under-inclusive of all dangerous friable asbestos, instructing its staff that "Regions should not assume that materials containing less than 1 percent asbestos do not pose an unreasonable risk to human health." (Doc. 7-4 at 2). The representative samples collected by the EPA that contain asbestos have considerably more than the one-percent rule of thumb articulated by the NESHAP and OSHA regulations and relied upon in CERCLA cleanups.

Based upon the information provided, the Court finds that the United States has presented substantial evidence of asbestos contamination. Arbitrary and capricious review "is deferential." *Tarkowski*, 248 F.3d at 602. This is especially important in the circumstances of this case, because determining whether a particular amount of asbestos contamination is hazardous to human health is the sort of determination that requires specialized knowledge and expertise that is outside the purview of most courts. Also unlike in *Tarkowski*, the United States has provided a rational basis for its assessment that the Site provides a real danger to public health, which was reflected in the Action Memorandum approved by the EPA.[4] *See Tarkowski*, 248 F.3d at 600 (requiring that the United States provide a "rational basis for believing there is any danger to the environment that would warrant" remedial action). Unlike in *Tarkowski*, where "there was no indication

---

[4] The EPA must consider a number of factors in determining the appropriateness of a removal action, *see* 40 C.F.R. § 300.415(b)(2)(i)-(viii), which it did in the Action Memorandum in this case. (*See* Doc. 4-5 at 7-9).

that [trace amounts of contaminants] exceeded the levels of these contaminants found in surrounding properties none of which was deemed to pose any kind of environmental hazard or to require or justify remedial efforts," here the EPA has provided considerably more evidence of contamination at the Site and has also expressed a rationale for why it believes that the site poses a public health danger. *See* 248 F.3d at 598. This basis, expressed in an approved Action Memorandum, sufficiently establishes the magnitude of the harm necessary to approve a removal action. *See U.S. v. W.R. Grace & Co.*, 429 F.3d 1224, 1234 (9th Cir. 2005) (concluding that "carefully documented reasoning" in EPA action memoranda can provide a basis for a removal action that is not arbitrary and capricious.).

**B. The EPA's proposed remedial plan**

*Tarkowsi* requires that courts in this circuit determine whether a proposed removal is arbitrary and capricious by considering the magnitude of the contamination against the scope of the EPA's proposed response action. 248 F.3d at 602. The Report and Recommendation characterized the proposed removal action as "at least the same 'blank check' sought in *Tarkowski*; indeed, even more than that." (Doc.6 at 15). It observed that the proposed removal plan "could go so far as demolishing the building, removing all debris, and covering over what once was the school building with vegetation, thereby obliterating all trace of the former building." (*Id.*).

However, the United States has provided a number of reasons why it believes that its proposed clean-up is reasonable and proportional. First, it argues that its clean-up complies with regulations related to removing asbestos and is consistent

with previous cleanups of asbestos-contaminated sites. (Doc. 7 at 13). Second, it argues that there are good reasons that it may have to demolish parts of the Site. The primary reason is that the building is in a severe state of disrepair and could pose dangers to EPA staff conducting the removal activity. For example, the on-site coordinator is concerned that there is a "very real danger of portions of the building collapsing." (*Id.* at 14).  He bases this conclusion on his observations as well as the Village of Vermont's determination that the building is both unsafe and dangerous and should be either remediated or demolished. (*Id.* at 12-13). If the building collapsed, it would present two types of distinct dangers. First, it would present an immediate harm to EPA staff conducting the cleanup. Second, it could exacerbate the asbestos contamination by disturbing soil and causing asbestos fibers to become airborne. (*Id.*). The United States may also need to conduct demolition to remove asbestos containing material or test for the presence of asbestos containing material. In light of this, the United States argues that this proposed clean-up is proportional to the evidence of contamination because the contamination is "significant and dangerous" and "the cleanup is tailored to address those conditions." (*Id.* at 14-15).

CERCLA is  not a nuisance-removal statute. *Tarkowski* is clear that the fact that a place is unsightly does not give the EPA license to "go ahead and rip up the property." 248 F.3d at 599. Instead, such drastic remedial action must be tied to a known environmental hazard. *Id.* Just as in *Tarkowski*, the Site at issue here is an eyesore. It is a fire-scarred shell of a building marked with graffiti and piles of debris. The Court is mindful that an impulse may exist for the EPA to "just get it all done," by demolishing the structure on the Site solely to get rid of it. However, if the

EPA can conduct all necessary testing and removal work without demolishing the structure or without demolishing parts of the structure, such demolition work would be arbitrary and capricious as it has no bearing on the EPA's stated purpose for seeking access to the Site.

Yet, as with the degree of contamination present on a given site, courts must defer to the EPA's judgment with respect to its removal plan. *See United States v. Saporito*, No. 07 C 3169, 2011 WL 2473332, at *3 (N.D. Ill. June 22, 2011) (explaining that determining the appropriate removal action "involves specialized knowledge and expertise," and is reserved to the discretion of the EPA for that reason). Courts can conduct the balancing required by *Tarkowski* while still deferring to the EPA's expertise. *Tarkowski* requires that the United States demonstrate that there is a hazard that justifies a remedial effort before authorizing the EPA to conduct such an effort. 248 F.3d at 601. The Court reads *Tarkowski* to stand for the proposition that when there is evidence of substantial contamination that the EPA determines must be abated, courts should confirm that the EPA's plan is not so expansive that it reaches beyond the necessary remedial action. Such a reading is consistent with Judge Ripple's gloss on the opinion, which is that the contemplated remedy should not "seem significantly disproportionate to the perceived violation." *Id.* at 603 (Ripple, J. concurring).

The Court concludes that the United States has satisfied *Tarkowski* by presenting rational reasons related to the known harm presented by asbestos for seeking the sort of access that it does seek. *See* 248 F.3d at 601. For that reason, its proposed remediation plan is not arbitrary and capricious. *See United States v. NCR*

*Corp.*, 911 F Supp. 2d 767, 773 (E.D. Wis. 2012) (explaining that decisions are arbitrary and capricious when they are knee-jerk or rushed and appear to have no scientific basis, and cautioning that courts must "give the government agency significant discretion to select a remedy" and should "only overturn that remedy if it appears to be outside the bounds of what is reasonable."). The Court cautions, however, that this Order does not provide the EPA with blanket authority to simply demolish the structure on the Site. During the hearing, On-Scene Coordinator Thomas assured the Court that the EPA will only conduct demolition if it is necessary as part of cleanup or testing efforts. This includes the potential hazard that a part of the structure could collapse on EPA workers, a hazard that will be evaluated by a structural engineer. In his testimony, Defendant Thomason agreed with the demolition of the structure if necessary to facilitate removal of asbestos containing materials, to further inspection and testing for asbestos, and for safety reasons.

## CONCLUSION

For the foregoing reasons, the Court respectfully rejects Magistrate Judge Hawley's Report and Recommendation (Doc. 6). Based upon the evidence provided by the United States in support of its Motion for Order in Aid of Immediate Access (Doc. 4), its Objection to the Report and Recommendation (Doc. 7), and the testimony of On-Site Coordinator Craig Thomas at the October 28, 2015 hearing, the Court concludes that the EPA's demand for entry onto the Site to conduct necessary removal and testing is not arbitrary and capricious. Therefore, the Court GRANTS the United States' Motion for Order in Aid of Immediate Access. (Doc. 3).

IT IS HEREBY ORDERED AS FOLLOWS:

1.  The EPA, including its officers, employees, contractors, and representatives, is authorized to immediately enter the Site, pursuant to Section 104(e) of CERCLA, 42 U.S.C. § 9604(e), for the purposes of performing additional sampling and  conducting a removal action at the Site, for a period of nine months from the date of this Order.

2.  The EPA is allowed access for the following activities:

   a.  developing a Site-specific sampling plan to conduct additional characterization of the Site and determine the extent of asbestos, lead, mercury, and other hazardous substances;
   b.   developing and implementing a Site Health and Safety Plan, including a Perimeter Air Monitoring and Sampling Plan and developing measures to control ACM dust, lead, mercury, and other hazardous substances present at the Site;
   c.  performing a removal action of hazardous substances, including excavating contaminated soil, transporting and disposing of all identified hazardous substances which pose a substantial threat of release off-Site, demolishing the building at the Site as necessary to identify hazardous substances or remove hazardous substances, excavating, recycling, loading, transporting, and disposing of hazardous substances, debris, and underlying soil;
   d.  conducting post-confirmation sampling to confirm the efficacy of the removal actions; backfilling excavated areas with clean material and topsoil; restoring excavated and disturbed areas; and vegetating as necessary in an attempt to prevent soil erosion; and
   e.  performing any other activities necessary to identify hazardous substances at the Site and remove those hazardous substances or otherwise redress the threat posed by those hazardous substances.

3.  The EPA shall further have the authority to bar any other persons from the Site, including Defendants Donna Gearing and Larry Thomason.

4.  Federal, state, and/or local law enforcement personnel are also allowed access to the Site for the duration of this Order for the purpose of providing security to personnel and equipment on the Site.

5.  Defendants Donna Gearing and Larry Thomason shall permit the EPA, including its officers, employees, contractors, and representatives, to enter onto the Vermont School Site for the purposes described in this Order, and shall refrain at all times from any interference with such entry and conduct of EPA activities at the Site.

6.  This Order shall remain in effect until it expires or is modified by the Court.

As this Order grants the relief that the United States seeks in its Complaint (Doc. 1), this CASE IS TERMINATED.

Entered this 30th day of October, 2015.

s/Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge
